## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

BOBBIE MOORE, SAMANTHA
HATFIELD, and GARY GRANT,
individually and on behalf of all others
similarly situated,

               *Plaintiffs*,

vs.

MEIJER, INC.,

               *Defendant.*

Case No.

JURY TRIAL DEMANDED

## <u>CLASS ACTION COMPLAINT</u>

# Table of Contents

I.      Introduction. ...................................................................................... 1

II.     Parties. .............................................................................................. 2

III.    Jurisdiction and Venue. ..................................................................... 3

IV.     Facts. ................................................................................................. 4

        A.      Defendant makes, markets, and sells Meijer products
                prominently labeled "Non-Drowsy." .................................... 4

        B.      The Non-Drowsy Meijer Products cause drowsiness. .......... 7

        C.      Defendant's Non-Drowsy representations misled reasonable
                consumers. ........................................................................... 9

        D.      Plaintiffs were misled by Defendant's misrepresentations. .............. 14

        E.      Class Action Allegations. .................................................. 15

        F.      Causes of Action. .............................................................. 18

VI.     Jury Demand. .................................................................................. 23

VII.    Prayer for Relief. ............................................................................ 23

# I.    Introduction.

1.      Defendant makes, sells, and markets over-the-counter cough, cold and flu medicine (the "Non-Drowsy Meijer Products" or "Products"), including generic Meijer versions of brands like DayQuil and Robitussin. [1]  Like the branded versions, these medicines contain the active ingredient Dextromethorphan Hydrobromide ("DXM"), an ingredient that causes drowsiness.

2.      Defendant's Non-Drowsy Meijer Products state prominently on the front of their label that they are "Non-Drowsy" and "Daytime" products (juxtaposed against Defendant's "Nighttime" versions).  By prominently labeling these products as "Non-Drowsy" and "Daytime," Defendant led Plaintiffs and other consumers to believe that the Non-Drowsy Meijer Products do not cause drowsiness, and that drowsiness is not a side effect of those products.  Defendant also led Plaintiffs and other consumers to believe that those products are for use during the day, and can be safely and satisfactorily consumed during waking hours, at work, and while driving and operating machinery.

3.      But the truth is that products containing DXM—and thus the Non-Drowsy Meijer Products—do cause drowsiness, and that drowsiness is a known side effect of DXM (a fact not known by the average consumer).  In reality, the Products cause drowsiness, which in effect destroys the primary reason for

---

[1] The Non-Drowsy Meijer Products include all Meijer products sold by Defendant that are labeled "Non-Drowsy" and that contain Dextromethorphan Hydrobromide.

purchasing the "Daytime" Products in the first place – for use during the day, when consumers do *not* want to be drowsy.

4.     In this way, Defendant misled Plaintiffs and other consumers about the effects of the Non-Drowsy Meijer Products.  This was a material misrepresentation that Plaintiffs—and other reasonable consumers—relied on when deciding to buy the products.  Had Defendant been truthful, Plaintiffs and other consumers would not have purchased the products or would have paid less for them.

5.     Plaintiffs bring this case for themselves and for millions of other consumers who purchased Non-Drowsy Meijer Products.

**II.    Parties.**

6.     Plaintiff Bobbie Moore is a citizen of Michigan (domiciled in Rockford).

7.     Plaintiff Samantha Hatfield is also a citizen of Michigan (domiciled in Peck).

8.     Plaintiff Gary Grant is a citizen of Ohio (domiciled in Nelsonville).

9.     The proposed class (identified below) includes citizens of every state within the United States.

10.    Defendant Meijer, Inc. is a Michigan corporation with its principal place of business in Grand Rapids, Michigan, and has been doing business in the

State of Michigan during all relevant times. Directly and through its agents, Meijer, Inc. has substantial contacts with, and receives substantial benefits and income from, the State of Michigan.

## III. Jurisdiction and Venue.

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed class are citizens of a state different from the Defendant.

12.     The Court has personal jurisdiction over Defendant because Defendant's principal place of business is in Michigan.

13.     Venue is proper under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(d) because Defendant would be subject to personal jurisdiction in this District if this District were a separate state, given that Defendant's principal place of business is in this district. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of Defendant's conduct giving rise to the claims occurred in this District, including selling the Non-Drowsy Meijer Products to Ms. Hatfield.

## IV. Facts.

### A. Defendant makes, markets, and sells Meijer products prominently labeled "Non-Drowsy."

14. Defendant manufactures, distributes, markets, and sells the Non-Drowsy Meijer Products.

15. The front label of each Product prominently states that the Product is "Non-Drowsy." For example:

**Meijer Daytime Cold & Flu Liquid Medicine**



**Meijer Daytime Severe Cold & Flu Caplets**



**Meijer Multi-Symptom Cold Cough Syrup**



16.     Further, the Products are sold as "Daytime" products that are meant to be consumed during the day, and offered for sale as an alternative to Defendant's "Nitetime" Cold & Flu Relief Products (which have no "Non-Drowsy" claim), such as the one pictured below:



17.     In reality, however, the "Daytime" version causes drowsiness. Accordingly, if reasonable consumers knew the truth, it would eviscerate the reason that consumers buy "Daytime" cold and flu relief products in the first place: to avoid drowsiness when they need to be alert.

18.     These representations are materially the same across all Non-Drowsy Meijer Products.

19. The Non-Drowsy Meijer Products do not disclose anywhere on their packaging that they do or can cause drowsiness, or that drowsiness is a side effect of the Non-Drowsy Meijer Products.

20. Based on the prominent "Non-Drowsy" and "Daytime" label included on the face of each product, a reasonable consumer would believe that the products do not cause drowsiness. That is, a reasonable consumer would believe that drowsiness is *not* a side effect of the product.

21. Indeed, Defendant labeled the products this way because it intended consumers to rely on the labels and to believe that the products would not cause drowsiness, so that consumers would buy more products or pay more for them.

**B. The Non-Drowsy Meijer Products cause drowsiness.**

22. In truth, products containing DXM—like each of the Non-Drowsy Meijer Products—do cause drowsiness. Drowsiness is a documented side effect of DXM at the recommended dosages. Authorities such as the National Library of Medicine [2] list drowsiness as a side effect of DXM.

23. Indeed, drowsiness is a common side effect at the recommended dosages. A study of DXM found that "[s]omnolence is a common side effect of centrally acting antitussive drugs" like dextromethorphan, and that 10.4% of users

---

[2] Dextromethorphan: MedlinePlus Drug Information, National Library of Medicine, https://medlineplus.gov/druginfo/meds/a682492.html (last accessed November 22, 2021).

of products containing dextromethorphan develop drowsiness within three days of starting treatment with DXM cough medicine.[3] The "cases of intense somnolence" were "related only to dextromethorphan" and not to the other drug studied. And the patients in this clinical study were given an even smaller dosage of DXM (15 mg three times a day) than the recommended dose found in many Non-Drowsy Meijer products.[4]

24.   Furthermore, the FDA's adverse event report database confirms that sedation (i.e., drowsiness) is one of the most frequently-cited side effects of dextromethorphan-containing products. [5]

---

[3] E. Catena and L. Daffonchio, "Efficacy and Tolerability of Levodropropizine in Adult Patients with Non-productive Cough, Comparison with Dextromethorphan," 10 Pulmonary Pharmacology & Therapeutics 89-96 (1997). The study reports this side effect as "somnolence." Somnolence means "the quality or state of being drowsy." Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/somnolence (last accessed November 22, 2021).
[4] For example, Meijer Daytime Severe Cold & Flu Relief liquid contains 10 mg of DXM per 15 ml of syrup and the recommended dosage is 30 ml orally every 4 hours. https://www.meijer.com/shopping/product/meijer-severe-daytime-cold-and-flu-relief-liquid-cold-medicine-12-oz/70882041628.html Likewise, the Meijer Cold & Flu Severe Multi Symptom Caplets contain 10 mg of DXM per capsule and the recommended dosage is two capsules every 4 hours. https://www.meijer.com/shopping/product/meijer-cold-flu-severe-multi-symptom-cool-taste-caplets-24/70882043765.html
[5] Sedation is associated with drowsiness. *See* IV/Monitored Sedation, American Society of Anesthesiologists, https://www.asahq.org/madeforthismoment/anesthesia-101/types-of-anesthesia/ivmonitored-sedation/ (even "minimal" sedation means that "you'll feel drowsy")

25.     For this reason, the Federal Aviation Administration prohibits pilots from flying after ingesting DXM. [6]

| | Cough/cold products | Coricidin (allowed if no chlorpheniramine)<br><br>guaifenesin (found in Mucinex and Robitussin)<br>Mucinex fast-max severe congestion and cough (liquid)<br><br>Identify combo vs isolated | dextromethorphan (Delsym)<br><br>Dayquil (contains dextromethorphan)<br><br>Most "night-time" or "PM" medications contain a sedating antihistamine:<br>- Coricidin HBP cough & cold (contains chlorpheniramine)<br>- Nyquil (contains doxylamine) | Most cough medications are safe for flight, but caution for combination products with sedating antihistamines. **If the label states PM (for nighttime use) or DM (containing dextromethorphan), you should not fly for at least 5 half-lives after the last dose (see above).** |
|---|---|---|---|---|
| **Cough** | | | | |

## C.     Defendant's Non-Drowsy representations misled reasonable consumers.

26.     The Food and Drug Administration prohibits drug labeling that is "false or misleading."  21 C.F.R. § 201.6.   It is misleading to label a product "Non-Drowsy" when it does cause drowsiness, or if drowsiness is a known side effect of one of its active ingredients.

27.     Defendant's false, deceptive, and misleading "Non-Drowsy" label statement violates 21 U.S.C. § 352(a)(1) and the so-called "little FDCA" statutes adopted by many states [7], which deem a drug misbranded when "its labeling is false or misleading in any particular."

---

[6]

https://www.faa.gov/licenses_certificates/medical_certification/media/OTCMedicationsforPilots.pdf

[7] *See, e.g.*, 20 M.C.L.A. § 333.17764.

28. Defendant's claims are misleading to consumers in violation of 21 U.S.C. § 352(a)(1) which states, "[a] drug … shall be deemed to be misbranded … If its labeling is false or misleading in any particular."

29. Based on the fact that Defendant labels the Non-Drowsy Meijer Products as "Non-Drowsy," a reasonable consumer would expect that those products do not cause drowsiness. Similarly, a reasonable consumer would expect that drowsiness is not a side effect of the products. Indeed, according to Consumer Reports, "'Non-drowsy' is code for antihistamines and other medications that don't make you sleepy." [8] This is the plain meaning of "non-drowsy," which means "not causing or accompanied by drowsiness." [9]

30. Meijer's advertisements and labeling do not contain any language that a reasonable consumer would understand to qualify these representations, or that would otherwise put a reasonable consumer on notice of the fact that the Non-Drowsy Meijer Products actually cause drowsiness.

31. Unlike Defendant, some other drug makers do not falsely claim that DXM-products are non-drowsy. For example, DXM is an active ingredient in Mucinex DM, sold by Reckitt. But the Mucinex label does not claim that Mucinex DM is non-drowsy, because this is not the truth:

---

[8] "How to read over the counter (OTC) drug labels," Consumer Reports, https://www.consumerreports.org/cro/2014/04/how-to-read-over-the-counter-drug-labels/index.htm

[9] https://www.merriam-webster.com/medical/nondrowsy



32.     Defendant could have simply omitted the false and misleading statements, "Non-Drowsy" and "Daytime" from its products.

33.     Or, if Defendant wanted to say something to indicate that a Non-Drowsy Meijer Product might cause *less* drowsiness than another Meijer product, it could have made a truthful statement to this effect, as other drug makers do.

34.     For example, Dramamine contains an active ingredient that causes drowsiness, Dimenhydrinate.  Dramamine also sells a "less drowsy" version that contains a different active ingredient, Meclizine, which causes less drowsiness. The front label of Dramamine Less Drowsy prominently displays that it is "less drowsy":



35.     Because Defendant makes and sells the Non-Drowsy Meijer Products, Defendant researched the known and common side effects of DXM.  This is diligence that large companies like Defendant would do when selling a drug.  As a result, Defendant knew that DXM causes drowsiness.  Furthermore, Defendant controls its labeling, knowingly put on the "Non-Drowsy" and "Daytime" representations, and knows the plain meaning of "Non-Drowsy."  Finally, it is standard practice in the industry to test labeling with consumers, and Defendant's testing would confirm that "Non-Drowsy" is misleading.  For these reasons, Defendant knew that its labeling was false and misleading, or was reckless or willfully blind to this fact.  And as alleged above, Defendant intended that consumers would rely on the "Non-Drowsy" and "Daytime" labeling, so that

consumers would purchase more products, pay a price premium, and buy them as alternatives to its "Nitetime" products.

36.     Whether or not an over-the-counter drug causes drowsiness is material to a reasonable customer.  In certain situations, consumers prefer over-the-counter drugs that will not make them drowsy to products that may make them drowsy. For example, all else equal, a reasonable consumer would prefer to take a drug that does not cause drowsiness to one that does cause drowsiness during the day (or any periods of time when they plan to be awake).  As a second example, if a consumer is planning to engage in activities that require them to be alert, or during which they would prefer to be alert, that consumer would prefer to take a drug that does not cause drowsiness to one that does.  Indeed, in many situations, taking a drug that does or can cause drowsiness can be dangerous.  For example, taking a drug that causes drowsiness while driving, or flying a plane, is dangerous.

37.     Defendant's false statements increased the demand for Non-Drowsy Meijer Products and allowed Defendant to charge a price premium.  As explained above, consumers specifically value the "Non-Drowsy" and "Daytime" claim because consumers demand cough medicine that will not make them drowsy (e.g., during the day, at work or while driving).  As a result, Defendant was able to charge more for these products than it would have been able to had the labeling been truthful.  Accordingly, as a direct result of Defendant's false statements,

Defendant was able to charge a price premium for these products. As purchasers, Plaintiffs and each class member paid this price premium and sustained economic injury.

**D.      Plaintiffs were misled by Defendant's misrepresentations.**

38.      In 2021, Ms. Moore bought a Non-Drowsy Meijer Product (Meijer Daytime Severe Cold & Flu) from a Meijer store in Greenville, Michigan. In Winter 2021, Ms. Hatfield bought a Non-Drowsy Meijer Product (Meijer Daytime Severe Cold & Flu) from a Meijer store in Fort Gratiot, Michigan. In December 2021, Mr. Grant bought a Non-Drowsy Meijer Product (Meijer Daytime Severe Cold & Flu) from a Meijer store in Lancaster, Ohio.

39.      The packages said "Non-Drowsy" and "Daytime" prominently on their labels, and Plaintiffs read and relied on those statements when purchasing the products. Accordingly, these representations and warranties were part of the basis of the bargain, in that Plaintiffs would not have purchased the Meijer "Non-Drowsy" Daytime Severe Cold & Flu on the same terms, or would not have purchased them at all, had Plaintiffs known these representations were not true. However, Plaintiffs did not receive the benefit of their bargain because their Non-Drowsy Meijer Products were not, in fact, "Non-Drowsy" or a "Daytime" medication. When Plaintiffs took the medication as directed by Defendant, they became unexpectedly drowsy. Plaintiffs would not have bought the products had

they known that the products did, in fact, cause drowsiness, and that drowsiness was a known side-effect of the product.

40. To be sure, Plaintiffs would purchase Non-Drowsy Meijer Products again if they were actually "Non-Drowsy" (i.e., if the product was sold as advertised). Plaintiffs, however, face an imminent threat of harm because they will not be able to rely on the labels in the future, and thus will not be able to purchase the products.

**E. Class Action Allegations.**

41. Plaintiffs bring the asserted claims on behalf of the proposed class of: all persons who purchased a Non-Drowsy Meijer Product in the United States during the applicable statute of limitations (the "**Nationwide Class**").

42. Plaintiff Moore and Hatfield also bring the asserted claims on behalf of the proposed class of: all persons who purchased a Non-Drowsy Meijer Product in Michigan during the applicable statute of limitations (the "**Michigan Subclass**").

43. Plaintiff Grant also bring the asserted claims on behalf of the proposed class of: all persons who purchased a Non-Drowsy Meijer Product in Ohio during the applicable statute of limitations (the "**Ohio Subclass**").

44. The following people are excluded from the Class and the Subclasses: (1) any Judge or Magistrate Judge presiding over this action and the members of

their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel, and their experts and consultants; and (6) the legal representatives, successors, and assigns of any such excluded persons.

### *Numerosity*

45.     The proposed class contains members so numerous that separate joinder of each member of the class is impractical.  There are millions of proposed class members.

### *Commonality*

46.     There are questions of law and fact common to the proposed class. Common questions of law and fact include, without limitation:

- Whether the Non-Drowsy Meijer Products cause drowsiness;

- Whether Defendant's labelling of the Non-Drowsy Meijer Products as "Non-Drowsy" and "Daytime" is deceptive and misleading;

- Whether Defendant committed a breach of express warranty; and,

- Damages needed to reasonably compensate Plaintiffs and the proposed class.

### Typicality

47.     Plaintiffs' claims are typical of the proposed class.  Like the proposed class, Plaintiffs purchased Non-Drowsy Meijer Products.  Like the proposed class, Plaintiffs would not have purchased the products, or would have paid less for them, had they known that the products cause drowsiness.

### Predominance and Superiority

48.     The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudication with respect to individual members, which would establish incompatible standards for the parties opposing the class.  For example, individual adjudication would create a risk that breach of the same express warranty is found for some proposed class members, but not others.

49.     Common questions of law and fact predominate over any questions affecting only individual members of the proposed class.  These common legal and factual questions arise from certain central issues which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any particular class member.  For example, a core

liability question is common: whether Defendant breached an express warranty by falsely marketing products that cause drowsiness as "Non-Drowsy."

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical.  It would be unduly burdensome to have individual litigation of millions of individual claims in separate lawsuits, every one of which would present the issues presented in this lawsuit.

**F.     Causes of Action.**

<u>**Count I: Breach of Express Warranty**</u>
**(on behalf of Plaintiffs, the Nationwide Class,
the Michigan Subclass, and the Ohio Subclass)**

51.     Plaintiffs incorporate by reference each and every factual allegation set forth above.

52.     Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class.

53.     Plaintiff Moore and Hatfield also bring this cause of action on behalf of themselves and the Michigan Subclass.

54.     Plaintiff Grant also brings this cause of action on behalf of himself and the Ohio Subclass.

55.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Non-Drowsy Meijer Products, issued material, written warranties by

representing that the products were "Non-Drowsy" and were "Daytime" products. These were affirmations of fact about the products (i.e., a description of the effects) and a promise relating to the goods.

56. Defendant marketed Non-Drowsy Meijer Products to consumers, and Defendant's warranty was the basis of the bargain and was relied-upon by Plaintiffs and Class members.

57. The Non-Drowsy Meijer Products do not conform to the above-referenced representations because they cause drowsiness. Thus, the warranty was breached.

58. Plaintiffs and members of the Nationwide Class and Subclasses were injured as a direct and proximate result of Defendant's breach because (a) they would not have purchased Non-Drowsy Meijer Products if they had known that the products cause drowsiness, and/or (b) they overpaid for the products because the products are sold at a price premium due to the warranty.

59. Plaintiffs provided Defendant with notice of this breach of warranty, by mailing a notice letter to Defendant's headquarters on February 14, 2022 and February 23, 2022.

### Count II: Breach of the Magnuson-Moss Warranty Act
**(on behalf of Plaintiffs and the Nationwide Class)**

60. Plaintiffs incorporate by reference each and every factual allegation set forth above.

61.     Plaintiffs allege this claim individually and on behalf of the Nationwide Class.

62.     Defendant supplied Non-Drowsy Meijer Products to consumers and Non-Drowsy Meijer Products are consumer products.

63.     Defendant issued material, written warranties by representing that the products were "Non-Drowsy" and "Daytime" products.  This was an affirmation of fact about the material in the products (i.e., a description of the effects of the ingredients) and a promise relating to the goods.

64.     Defendant represented that the material inside the Non-Drowsy Meijer Products (the ingredients) would meet a specified level of performance over a specified period of time.  Defendant represented that, when taken at the recommended dosages, the products' ingredients would not cause drowsiness and drowsiness is not a side-effect.

65.     Defendant marketed Non-Drowsy Meijer Products to consumers, and Defendant's warranty was the basis of the bargain and was relied-upon by Plaintiffs and Class members.

66.     In fact, the Non-Drowsy Meijer Products do not conform to the above-reference representation because, as alleged in detail above, they cause drowsiness.  Thus, the warranty was breached.

67.     Plaintiffs provided Defendant with notice of this breach of warranty by mailing a notice letter to Defendant's headquarters on February 14, 2022 and February 23, 2022.

68.     Plaintiffs and the Nationwide Class were injured as a direct and proximate result of Defendant's breach, and this breach was a substantial factor in causing harm, because (a) they would not have purchased the Non-Drowsy Meijer Products if they had known that the products cause drowsiness, or (b) they overpaid for the products because the products are sold at a price premium due to the warranty.

### Count III: Intentional Misrepresentation
**(on behalf of Plaintiffs, the Nationwide Class,
the Michigan Subclass, and the Ohio Subclass)**

69.     Plaintiffs incorporate by reference each and every factual allegation set forth above.

70.     Plaintiffs allege this claim individually and on behalf of the Nationwide Class.

71.     Plaintiff Moore and Hatfield also bring this cause of action on behalf of themselves and the Michigan Subclass.

72.     Plaintiff Grant also brings this cause of action on behalf of himself and the Michigan Subclass.

73.     As alleged in detail above, Defendant's labeling represented to Plaintiffs and Class members that the Products do not cause drowsiness, that drowsiness is not a side effect of these products, and that the Products are for "Daytime" use.

74.     These representations were false and misleading.  As alleged above, the Products do cause drowsiness and drowsiness is a documented side effect.

75.     As alleged in detail above, when Defendant made these misrepresentations, it knew that they were false, was reckless to the truth, or was willfully blind.

76.     Defendant intended that Plaintiffs and Class members rely on these representations and Plaintiffs and class members read and reasonably relied on them.

77.     Defendant's misrepresentations were a substantial factor and proximate cause in causing damages and losses to Plaintiffs and Class members.

78.     Plaintiffs and Class members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Products if they had known that they cause drowsiness, and/or (b) they overpaid for the products because the products are sold at a price premium due to the misrepresentation.

## VI. Jury Demand.

79.    Plaintiffs demands a jury trial on all issues so triable.

## VII. Prayer for Relief.

80.    Plaintiffs seek the following relief for themselves and the proposed

class and subclasses:

- An order certifying the asserted claims, or issues raised, as a class action;

- A judgment in favor of Plaintiffs and the proposed class;

- Damages, including statutory, treble, and punitive damages where applicable;

- Restitution;

- Disgorgement, and other just equitable relief;

- Pre- and post-judgment interest;

- An injunction prohibiting Defendant's deceptive conduct, as allowed by law;

- Reasonable attorneys' fees and costs, as allowed by law; and

- Any additional relief that the Court deems reasonable and just.

Date: February 24, 2022                    Respectfully submitted,

By:    _/s/ *Nick Suciu, III*_____
                    Nick Suciu, III

MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
Nick Suciu, III (State Bar No. P72052)
6905 Telegraph Road Suite 115
Bloomfield Hills, MI 48301
Telephone: 313-303-3472
nsuciu@milberg.com

BURSOR & FISHER, P.A.
Yeremey Krivoshey (Cal. Bar No. 295032)*
Brittany S. Scott (Cal. Bar No. 327132)*
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
(925) 300-4455
ykrivoshey@bursor.com
bscott@bursor.com

DOVEL & LUNER, LLP
Jonas Jacobson (Cal. Bar No. 269912)*
Simon Franzini (Cal. Bar No. 287631)*
201 Santa Monica Blvd., Suite 600
Santa Monica, CA 90401
(310) 656-7066
jonas@dovel.com
simon@dovel.com

*Counsel for Plaintiffs*
**Pro Hac Vice* Forthcoming